**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**


Richard Ponn,                                   :               Case No. 1:13 CV 931

             Plaintiff,                         :

                                                                                      :

v.                                               :

Commissioner of Social Security,                :               **MEMORANDUM OPINION**
             Defendant,                         :               **AND ORDER**


## I. INTRODUCTION

Plaintiff Richard Ponn ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and 423 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 15 and 16). For the reasons that follow, the decision of the Commissioner is affirmed in part and reversed and remanded in part.

## II. PROCEDURAL BACKGROUND

On February 23, 2010, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 11, p. 131 of 601).[1] In his application,

---

[1] Plaintiff also filed an application for Supplemental Security Income ("SSI") on February 23, 2010, alleging disability beginning on November 15, 2008 (Docket No. 11, p. 153 of 601). It appears that

1

Plaintiff alleged a period of disability beginning November 15, 2008 (Docket No. 11, p. 131 of 601). Plaintiff's claim was denied initially on July 16, 2010 (Docket No. 11, p. 64 of 601), and upon reconsideration on November 8, 2010 (Docket No. 11, p. 71 of 601). Plaintiff thereafter filed a timely written request for a hearing on November 16, 2010 (Docket No. 11, p. 78 of 601).

On January 24, 2012, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Ben Barnett ("ALJ Barnett") (Docket No. 11, pp. 32-61 of 601). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 11, pp. 53-59 of 601). ALJ Barnett found Plaintiff to have a severe combination of epilepsy, status post aneurysm clipping, history of cocaine, cannabis, and alcohol dependence, neuropathic headaches, mood disorder, generalized anxiety disorder, and depressive disorder with an onset date of November 15, 2008 (Docket No. 11, p. 18 of 601).

Despite these limitations, ALJ Barnett determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of his decision (Docket No. 11, p. 26 of 601). ALJ Barnett found Plaintiff had the residual functional capacity to perform medium work with the following limitations: (1) no climbing of ladders, ropes, or scaffolds; (2) no exposure to hazards such as operational control of moving machinery and unprotected heights; (3) only simple, routine, repetitive tasks; (4) work only in a low stress job with no more than occasional decision making and changes in the work setting; (5) no production rate or pace work; and (6) only superficial interaction with the public and coworkers (Docket No. 11, p. 21 of 601). ALJ Barnett found Plaintiff unable to perform his past relevant work, but able to perform other work in the national economy (Docket No. 11, p. 25-26 of 601). Plaintiff's

Plaintiff did not pursue this claim.

request for benefits was therefore denied (Docket No. 11, p. 26 of 601).

On April 25, 2013, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of his denial of DIB (Docket No. 1). In his pleading, Plaintiff alleged the ALJ erred by: (1) violating the treating physician rule; (2) ignoring portions of a consultative examiner's opinion; (3) assigning great weight to the opinions of state agency physicians; and (4) relying on VE testimony (Docket No. 15). Defendant filed its Answer on August 6, 2013 (Docket No. 10).

### III. FACTUAL BACKGROUND

### A. ADMINISTRATIVE HEARING

An administrative hearing convened on January 24, 2012 (Docket No. 11, pp. 32-61 of 601). Plaintiff, represented by counsel Marcia Margolius, appeared and testified in Cleveland, Ohio (Docket No. 11, p. 34 of 601). ALJ Barnett appeared via video from St. Louis, Missouri (Docket No. 11, p. 34 of 601). Also present and testifying was VE Robert A. Mosley ("VE Mosley") (Docket No. 11, pp. 53-59 of 601).

### 1. PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was a thirty-six year old married man (Docket No. 11, pp. 38, 44 of 601). Plaintiff stated that he graduated from high school and attended approximately a year and a half of college (Docket No. 11, pp. 38-39 of 601). He also had training in welding (Docket No. 11, p. 39 of 601).

With regard to his past employment, Plaintiff testified that he most recently worked for McCallister Landscaping performing maintenance work on trucks (Docket No. 11, p. 39 of 601). He was terminated after he began experiencing headaches, which prevented him from doing his job

3

(Docket No. 11, p. 39 of 601). Prior to McCallister, Plaintiff worked for T&D Fabricating doing tool and die work, as well as maintenance work on machinery (Docket No. 11, p. 40 of 601). Plaintiff testified that he also worked for Fredon Corporation and Altec running lathes and doing tool and die work, respectively (Docket No. 11, p. 40 of 601). Plaintiff indicated that, at one point, he held three jobs simultaneously (Docket No. 11, p. 41 of 601). When asked what prevented him from returning to work, Plaintiff stated that he gets overheated easily and experiences pain related to the plate in his head (Docket No. 11, p. 41 of 601). Plaintiff also indicated that he has difficulty multi-tasking and can no longer maintain his concentration (Docket No. 11, p. 42 of 601).

Plaintiff gave minimal testimony about his physical impairments. When asked about his seizures, Plaintiff testified that his last seizure occurred in July 2011 (Docket No. 11, pp. 48-49 of 601). His seizures usually last approximately five to ten minutes and it takes him one to two days to recover (Docket No. 11, p. 49 of 601). Plaintiff stated that he was taking Dilantin to successfully control his seizures (Docket No. 11 of 47 of 601). He had reached a point where he could drive, but decided to refrain from doing so after his seizure in July 2011 (Docket No. 11, p. 47 of 601). Plaintiff also indicated he experiences pain on the left front portion of his scalp, underneath his scar (Docket No. 11, pp. 51-52 of 601).

When asked about daily activities, Plaintiff stated that he has both good and bad days (Docket No. 11, pp. 43-44 of 601). On a "good" day, Plaintiff testified that he could work for three to four hours before needing to take a rest (Docket No. 11, p. 43 of 601). On a "bad" day, Plaintiff described the whole day as being a rest period (Docket No. 11, p. 43 of 601). In a normal week, Plaintiff stated that he experiences three good days and four bad days (Docket No. 11, pp. 43-44 of 601). Plaintiff stated he can read for short periods of time, approximately ten to fifteen minutes, watch television, and

socialize with friends (Docket No. 11, pp. 44-45 of 601). Plaintiff indicated he has to limit his social interaction to approximately ninety minutes, otherwise he starts to get agitated, snippy, and rude (Docket No. 11, p. 45 of 601). Plaintiff testified that he usually gets five to six hours of sleep, but does not wake up feeling refreshed (Docket No. 11, p. 48 of 601). Plaintiff admitted to prior use of illegal drugs but stated he had not used such substances since being released from prison (Docket No. 11, p. 49 of 601).

2.     **VOCATIONAL EXPERT TESTIMONY**

Having familiarized himself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as an automotive maintenance equipment servicer as medium and skilled, as a machinest as medium and skilled, as a tool and die maker as medium and skilled, and as an inspector and packager as light and unskilled (Docket No. 11, pp. 53-54 of 601).

ALJ Barnett then posed his first hypothetical question:

Hypothetical one, assume an individual the claimant's age, education, and work experience who is limited to the full range of medium exertional work as defined in the regulations with no climbing of ladders, ropes, or scaffolds and must avoid all exposure to hazards such as operational control of moving machinery and unprotected heights. Additionally, the individual is limited to simple, routine, and repetitive tasks, limited to low stress job[] defined as no more than occasional decision making required and no more than occasional changes in the work setting. Such an individual would be restricted to no production rate or pace work, that is no, no straight production requirements, and limited to superficial interaction with the public and with coworkers. Could such an individual return to any of the past work you testified to?

(Docket No. 11, pp. 54-55 of 601). Taking into account these limitations, the VE testified that such an individual would be unable to perform any of Plaintiff's past relevant work (Docket No. 11, p. 57 of 601). The VE stated there was other work that the hypothetical person could perform, including: (1)

5

kitchen helper, listed under DOT[2] 318.687-010, for which there are 500,000 positions nationally and 3,500 in northeast Ohio; (2) folder, listed under DOT 369.687-018, for which there are 200,000 positions nationally and 1,200 in northeast Ohio; (3) bagger, listed under DOT 920.687-018, for which there are 100,000 positions nationally and 1,000 in northeast Ohio; and (4) hand packager, listed under DOT 920.587-018, for which there are 100,000 positions nationally and 1,100 in northeast Ohio (Docket No. 11, p. 57 of 601).

In an amendment to this hypothetical question, ALJ Barnett questioned whether these positions would be available to an individual who required four unscheduled, fifteen-minute breaks during the day (Docket No. 11, p. 58 of 601). The VE responded in the negative and indicated that the industry standard was three breaks: one in the morning, one for lunch, and one in the afternoon (Docket No. 11, p. 58 of 601). A fourth break would be a "special accommodation" (Docket No. 11, p. 58 of 601).

During cross examination, Plaintiff's counsel asked the VE if employers were tolerant with regard to "temper or emotional outbursts" on the job that occurred at least once per week (Docket No. 11, p. 59 of 601). The VE indicated that such behavior would not be tolerated (Docket No. 11, p. 59 of 601).

**B.    MEDICAL RECORDS**

**1.    PHYSICAL HEALTH ISSUES**

Plaintiff's medical records regarding his physical impairments date back to January 28, 2009, when Plaintiff presented to the Lake Hospital Emergency Room ("Lake ER") complaining of a persistent headache (Docket No. 11, p. 363 of 601). Plaintiff underwent a CT scan of his head, which was initially read as normal (Docket No. 11, pp. 348, 363 of 601). A lumbar puncture showed an

---

[2] Dictionary of Occupational Titles.

elevated red cell count, prompting an angiogram (Docket No. 11, pp. 341, 363 of 601). The angiogram revealed a five-millimeter left middle cerebral artery ("MCA") aneurysm (Docket No. 11, pp. 363, 471 of 601). Plaintiff was admitted to the hospital and, on January 30, 2009, underwent a left craniotomy[3] and clipping of the aneurysm (Docket No. 11, p. 363 of 601). While sedated, Plaintiff experienced a seizure (Docket No. 11, p. 363 of 601). Plaintiff was discharged on February 5, 2009 (Docket No. 11, p. 363 of 601).

On February 28, 2009, Plaintiff returned to the Lake ER complaining of swelling in his left temporal area (Docket No. 11, p. 334 of 601). Plaintiff indicated that he was non-compliant with his Dilantin (Docket No. 11, p. 328 of 601). A CT scan showed evidence of a thin left lateral frontal and anterior temporal subdural hygroma,[4] a large subgaleal hygroma[5] or seroma[6] overlying the left lateral craniotomy, but no acute intracranial hemorrhage or abnormal area of decreased or increased attenuation within the brain (Docket No. 11, p. 334 of 601). On March 1, 2009, Plaintiff returned to the Lake ER again complaining of pain at his left temple (Docket No. 11, p. 322 of 601).

On March 8, 2009, Plaintiff presented to the Case Medical Center Emergency Room ("Case ER") complaining of nausea and vomiting and a significant amount of subgaleal fluid collection (Docket No. 11, p. 361 of 601). Plaintiff was admitted and underwent both a subgaleal fluid tap as well as a lumbar drain (Docket No. 11, p. 361 of 601). Plaintiff was discharged in stable condition on

---

[3] A surgical cutting into the cranium or skull. ATTORNEYS' DICTIONARY OF MEDICINE, C-29749 (2009).

[4] A collection of fluid in a subdural space of the brain, usually as a result of the disintegration and liquefaction of a subdural hematoma. ATTORNEYS' DICTIONARY OF MEDICINE, S-110419.

[5] A hygroma is a cyst filled with fluid. ATTORNEYS' DICTIONARY OF MEDICINE, H-56913.

[6] A tumor-like mass consisting of an accumulation of serum in a tissue. ATTORNEYS' DICTIONARY OF MEDICINE, S-105583.

7

March 12, 2009 (Docket No. 11, p. 361 of 601). On March 24, 2009, Plaintiff was admitted to the Southwest General Health Center for another subgaleal fluid collection (Docket No. 11, p. 410 of 601). Plaintiff also underwent a removal of a bone flap and a cranioplasty[7] with titanium mesh (Docket No. 11, p. 414 of 601). He was discharged on March 27, 2009 (Docket No. 11, p. 410 of 601). A May 8, 2009, CT scan showed no significant changes or lesions in Plaintiff's brain (Docket No. 11, p. 408 of 601).

Plaintiff again presented to the Case ER on May 18, 2009, after falling and hitting his head while playing basketball (Docket No. 11, p. 360 of 601). A CT scan showed minor kinking of the titanium mesh and a small underlying subdural and subarachnoid component, but Plaintiff was otherwise neurologically intact (Docket No. 11, p. 360 of 601).

Plaintiff was thereafter scheduled to have the titanium mesh in his head replaced with hard tissue (Docket No. 11, p. 398 of 601). On June 2, 2009, Plaintiff underwent a medical risk assessment with Dr. Aleksandyr W. Lavery, MD ("Dr. Lavery") (Docket No. 11, p. 398 of 601). Plaintiff complained of some residual weakness in his left lower extremity after his aneurysm, but no dizziness, syncope, numbness, tingling, seizures, tremors, headaches, paralysis, eye pain, vision troubles, ear pain, or hearing impairment (Docket No. 11, pp. 398-99 of 601). Plaintiff admitted to smoking one and a half packs of cigarettes per day and smoking marijuana on occasion (Docket No. 11, p. 398 of 601). Plaintiff was cleared for the procedure (Docket No. 11, p. 401 of 601).

On September 9, 2009, Plaintiff underwent a CT scan which showed a small water density subdural fluid collection underlying the craniotomy site and several small, unchanged foci of

---

[7] A plastic surgical operation for the correction or repair of a defect in the bones of the cranium, i.e., those bones of the skull which form the sphere containing the brain. ATTORNEYS' DICTIONARY OF MEDICINE, C-29730.

encephalomalacia[8] within the left frontal lobe (Docket No. 11, p. 444 of 601). Nevertheless, there was

no definite evidence of acute hemorrhage or infarct[9] (Docket No. 11, p. 445 of 601). An

electroencephalogram ("EEG") performed on the same day showed no epileptiform discharges

(Docket No. 11, p. 485 of 601). A CT scan done on October 7, 2009, showed no evidence of acute

hemorrhage or infarct but did show a slight interval decrease in fluid collection underlying the

craniotomy site and a slight interval increase of fluid collection overlying the craniotomy site (Docket

No. 11, p. 449 of 601). An MRI done on October 27, 2009, showed minimal left frontal

encephalomalacia and gliosis,[10] but nothing to suggest the presence of an infection (Docket No. 11, p.

451 of 601).

Plaintiff began seeing neurologist Dr. Rose M. Dotson, MD ("Dr. Dotson") on September 3,

2009 (Docket No. 11, p. 459 of 601).[11] On October 27, 2009, Plaintiff indicated that he had not

experienced a seizure since his last visit on September 18, 2009, and reported no neurological

symptoms (Docket No. 11, p. 469 of 601). He stated that his pain intensity ranged from a four to nine

out of a possible ten, with a twenty percent reduction with his current treatment (Docket No. 11, p. 469

of 601). Plaintiff indicated that he had discontinued his Gabapentin due to personality and mood

changes, and restarted his Dilantin (Docket No. 11, p. 469 of 601). Plaintiff also reportedly stopped

---

[8] A softening of the brain, usually caused by a deficiency of blood in the affected part. ATTORNEYS' DICTIONARY OF MEDICINE, E-39797.

[9] A region of dead or dying tissue which is the result of a sudden obstruction to the blood circulation supplying the involved part, usually by a clot. ATTORNEYS' DICTIONARY OF MEDICINE, I-60231.

[10] An overgrowth of neuroglia, the supporting tissue and framework of the nervous system, at the expense of the true nerve tissue. ATTORNEYS' DICTIONARY OF MEDICINE, G-50039.

[11] Plaintiff, Defendant, and ALJ Barnett repeatedly refer to his physician as Dr. Rose M. *Dolson*, not Dotson. This appears to be in error.

drinking alcohol two weeks prior to the appointment (Docket No. 11, p. 469 of 601). Upon examination, Plaintiff was alert and fully oriented and displayed normal speech, language, gait, and posture (Docket No. 11, p. 469 of 601). Dr. Dotson diagnosed Plaintiff with partial complex epilepsy with secondary generalization (non-intractable) (Docket No. 11, p. 469 of 601). Plaintiff was ordered to continue with his Dilantin (Docket No. 11, p. 469 of 601). Plaintiff returned to Dr. Dotson on January 28, 2010, reporting a possible seizure in December 2009 (Docket No. 11, pp. 470, 538 of 601). Plaintiff indicated that he did not lose consciousness or experience tonic/clonic movements, mouth or tongue biting, or bowel/bladder incontinence (Docket No. 11, pp. 470, 538 of 601). Plaintiff's diagnosis remained unchanged (Docket No. 11, pp. 470, 538 of 601).

On April 27, 2010, Plaintiff returned to Dr. Dotson reporting no new neurologic symptoms (Docket No. 11, pp. 463, 540 of 601). Plaintiff denied having any seizures for the past six months (Docket No. 11, pp. 463, 540 of 601). He rated his pain between a seven and nine out of a possible ten, but reported a sixty percent reduction in pain as a result of Percocet (Docket No. 11, pp. 463, 540 of 601). Plaintiff was alert, fully oriented, and possessed a good fund of knowledge and judgment (Docket No. 11, pp. 463, 540 of 601). Plaintiff also had normal speech, language, gait, and posture (Docket No. 11, pp. 463, 540 of 601). His diagnosis remained unchanged (Docket No. 11, pp. 463, 540 of 601).

Four months later, Plaintiff returned to Dr. Dotson reporting a partial complex seizure without generalization in July 2010 (Docket No. 11, p. 541 of 601). Plaintiff indicated that he had seizures every couple of months and wondered whether these seizures were caused by stress (Docket No. 11, p.

10

541 of 601). He rated his head pain between a five and nine out of a possible ten but reported a seventy

percent reduction in pain as a result of the Percocet (Docket No. 11, p. 541 of 601). Plaintiff denied

any new neurologic symptoms (Docket No. 11, p. 541 of 601). Plaintiff was fully oriented with a good

fund of knowledge and judgment (Docket No. 11, p. 541 of 601). He possessed normal speech,

language, gait, and posture (Docket No. 11, p. 541 of 601). His diagnosis remained unchanged (Docket

No. 11, p. 541 of 601). Plaintiff underwent a CT scan on September 18, 2010 (Docket No. 11, p. 564

of 601). The results were normal (Docket No. 11, p. 564 of 601).

      Plaintiff saw Dr. Dotson again on December 14, 2010, complaining of pain between eight and

nine out of a possible ten, with a seventy percent reduction with Percocet (Docket No. 11, p. 562 of

601). At that time, Plaintiff reported that his last seizure occurred two months earlier (Docket No. 11,

p. 562 of 601). Plaintiff did not report any new neurologic symptoms, but did note that he had

difficulty staying asleep and, according to his wife, tended to jerk significantly during the night,

resulting in daytime fatigue (Docket No. 11, p. 562 of 601). Plaintiff was alert, fully oriented, and

possessed a good fund of knowledge, recent and remote memory, and judgment (Docket No. 11, p. 562

of 601). His speech, language, gait, and posture were all normal (Docket No. 11, p. 562 of 601). Dr.

Dotson made additional findings with Plaintiff's diagnosis, including possible periodic limb movement

disorder, possible REM behavior disorder, and possible sleep apnea (Docket No. 11, p. 563 of 601).

      On January 20, 2011, Plaintiff underwent neuropsychological testing (Docket No. 11, p. 584 of

601). The tests revealed an average full-scale IQ and strong non-verbal skills (Docket No. 11, p. 584 of

601). The tests also showed slowed fine motor speed, phonemic verbal fluency, and a weak learning of

a word list (Docket No. 11, p. 584 of 601). Plaintiff displayed a consistent pattern of poor long-

standing coping ability and possible attention deficit hyperactivity disorder ("ADHD") (Docket No.

11

11, p. 584 of 601). Plaintiff was diagnosed with clinically meaningful depression and anxiety (Docket
No. 11, p. 584 of 601). Dr. Dotson noted that Plaintiff was "likely cognitively capable of returning to
work following appropriate treatment of depression and anxiety and with use of few accommodations
and compensatory techniques" (Docket No. 11, p. 584 of 601). Dr. Dotson did not provide any specific
accommodations or compensatory techniques (Docket No. 11, p. 584 of 601). During a follow-up
appointment on April 14, 2011, Dr. Dotson amended Plaintiff's diagnosis to include anxiety and
depression (Docket No. 11, p. 584 of 601). Plaintiff indicated that he did not wish to start any
medication for these disorders (Docket No. 11, p. 584 of 601).

Plaintiff returned to Dr. Dotson on October 13, 2011 (Docket No. 11, p. 587 of 601). Plaintiff
indicated that he had not had any seizures in the past six months and reported compliance with and no
side effects from his current treatment (Docket No. 11, p. 587 of 601). He rated his pain as a seven to
nine out of a possible ten, with a seventy percent reduction with Percocet (Docket No. 11, p. 587 of
601). Plaintiff's diagnosis remained unchanged (Docket No. 11, p. 587 of 601).

### 2.   MENTAL HEALTH ISSUES

Plaintiff's mental health records date back to March 28, 2008, when Plaintiff participated in a
General Ability Measure for Adults ("GAMA") test, which assessed Plaintiff's general IQ in an
average range at 107 (Docket No. 11, p. 306 of 601). On May 5, 2008, records show that Plaintiff was
not in need of mental health services (Docket No. 11, p. 295 of 601).[12]

Plaintiff's mental health records then jump to July 26, 2011, when Plaintiff saw Patricia Kelly,
CNP ("Ms. Kelly") (Docket No. 11, p. 566 of 601). During a physical evaluation of Plaintiff, Ms.
Kelly also diagnosed Plaintiff with depression, anxiety, and ADHD (Docket No. 11, p. 566 of 601).

---

[12] These assessments appear to take place while Plaintiff was incarcerated.

12

Plaintiff was referred for psychiatric treatment (Docket No. 11, p. 567 of 601). Plaintiff underwent an

initial psychiatric evaluation with Denise Flynn, MSN, CNS ("Ms. Flynn") on October 31, 2011

(Docket No. 11, pp. 581-83 of 601). At that time, Plaintiff was living with his mother, wife, and two

children (Docket No. 11, p. 581 of 601). Plaintiff reported feeling overwhelmed (Docket No. 11, p.

581 of 601). During the evaluation, Plaintiff was anxious and had difficulty sitting still (Docket No.

11, p. 582 of 601). Plaintiff also reported disrupted sleep, short term memory loss, and panic attacks

(Docket No. 11, p. 582 of 601). His concentration and focus were poor, but his long-term memory was

intact (Docket No. 11, p. 582 of 601). Plaintiff denied auditory or visual hallucinations (Docket No.

11, p. 582 of 601). His insight and judgment were fair (Docket No. 11, p. 582 of 601). Ms. Flynn

diagnosed Plaintiff with mood disorder secondary to a medical condition, ADHD by report, and

generalized anxiety disorder, and assigned him a Global Assessment of Functioning ("GAF") score of

fifty[13] (Docket No. 11, p. 582 of 601). Plaintiff reluctantly agreed to try Oleptro, an anti-depressant, to

help manage his symptoms (Docket No. 11, pp. 582-83 of 601). Plaintiff returned to Ms. Flynn on

November 22, 2011, reporting no new symptoms but stating that he had discontinued use of the

Oleptro (Docket No. 11, p. 590 of 601). On March 9, 2012, Plaintiff discontinued his sessions with

Ms. Flynn, citing a disagreement over his medication (Docket No. 11, p. 591 of 601).

In conjunction with Ms. Flynn, Plaintiff also attended counseling with Lori Diamond, MSSA,

LISW-S ("Ms. Diamond"). On February 6, 2012, Plaintiff stated that he felt counseling would be

helpful and agreed to participate in weekly sessions (Docket No. 11, p. 594 of 601). Plaintiff saw Ms.

---

[13] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

Diamond seven times from February 6, 2012, through April 13, 2012 (Docket No. 11, pp. 590-600 of

601). Plaintiff was always alert and oriented and, by mid-March 2012, reported an improved ability to

manage his emotions (Docket No. 11, pp. 590-600 of 601).

## C.    EVALUATIONS

### 1.    PSYCHOLOGICAL EVALUATION

On June 29, 2010, Plaintiff underwent a Psychological Evaluation with clinical psychologist

Dr. Richard C. Halas, MA ("Dr. Halas"), at the request of the Bureau of Disability Determination

("BDD") (Docket No. 11, pp. 500-05 of 601). Plaintiff appeared disheveled and generally unkempt but

was oriented to time, place, and person (Docket No. 11, p. 501 of 601). He seemed hesitant and

nervous, but cooperative (Docket No. 11, p. 501 of 601). Plaintiff had a flat and constricted

presentation and generally tended to minimize or deny problems (Docket No. 11, p. 502 of 601).

Plaintiff's speech pattern was slow and his thoughts were rambling, rather than specific and goal-

oriented (Docket No. 11, p. 502 of 601). The coherency and relevancy of his responses were good, but

Plaintiff showed a slight flight of ideas (Docket No. 11, p. 502 of 601). Plaintiff denied any thoughts of

hurting himself or others, but admitted to crying spells and feelings of hopelessness, helplessness, and

worthlessness (Docket No. 11, p. 502 of 601). Plaintiff had relatively high levels of anxiety and

seemed tense, anxious, and apprehensive during the evaluation (Docket No. 11, p. 502 of 601).

With regard to sensorium and cognitive functioning, Plaintiff's overall quality of consciousness

was good and he did not show any confusion or lack of awareness (Docket No. 11, p. 503 of 601). His

short-term memory was good and he was able to do simple calculations (Docket No. 11, p. 503 of

601). Plaintiff's thinking was more concrete than abstract, but his general intelligence level was

estimated to be in the average range (Docket No. 11, p. 503 of 601). Plaintiff also displayed reasonably

14

good levels of insight and judgment (Docket No. 11, p. 503 of 601).

Dr. Halas also performed intellectual testing on Plaintiff. Plaintiff's verbal scale IQ was high average and his perceptual reasoning and working memory IQ scores were average (Docket No. 11, p. 504 of 601). Plaintiff earned a full-scale IQ score of 101 (Docket No. 11, p. 504 of 601). Dr. Halas noted that Plaintiff's primary weakness was in processing speed (Docket No. 11, p. 504 of 601). Plaintiff scored below average in symbols and mathematical skills but was average in his verbal abstractions and vocabulary skills and significantly above average with regard to his current fund of information (Docket No. 11, p. 504 of 601). Dr. Halas noted that there was a "significant discrepancy between [Plaintiff's] scores" (Docket No. 11, p. 504 of 601).

Dr. Halas diagnosed Plaintiff with depressive disorder not otherwise specified ("NOS"), anxiety disorder NOS, and assigned him a GAF score of forty-five[14] (Docket No. 11, pp. 504-05 of 601). He indicated that Plaintiff's ability to understand, remember, and follow instructions, as well as his ability to maintain attention and concentration to perform simple, repetitive tasks was not impaired (Docket No. 11, p. 505 of 601). Plaintiff's ability to relate to others, including coworkers and supervisors, was mildly impaired (Docket No. 11, p. 515 of 601). Dr. Halas found Plaintiff's ability to withstand the stresses and pressures associated with most day-to-day work activities to be moderately impaired (Docket No. 11, p. 505 of 601).

2.     PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff underwent a Physical Residual Functional Capacity Assessment with state examiner Dr. Gerald Klyop, MD ("Dr. Klyop") on July 8, 2010 (Docket No. 11, pp. 511-18 of 601). Dr. Klyop

---

[14] A score of 45 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV, 34.

determined that Plaintiff could: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for a total of six hours during an eight-hour workday; (4) sit for a total of six hours during an eight-hour workday; and (5) engage in unlimited pushing and/or pulling (Docket No. 11, p. 512 of 601). Plaintiff was restricted to never climbing ladders, ropes, or scaffolds and avoiding all exposure to hazards (Docket No. 11, pp. 513, 515 of 601). Plaintiff otherwise had no postural, manipulative, visual, communicative, or environmental limitations (Docket No. 11, pp. 513-15 of 601).

### 3.   PSYCHIATRIC REVIEW TECHNIQUE

On July 9, 2010, Plaintiff underwent a Psychiatric Review Technique with state examiner Dr. Leslie Rudy, Ph.D ("Dr. Rudy") (Docket No. 11, pp. 519-32 of 601). Dr. Rudy noted that Plaintiff suffered from depressive disorder NOS and anxiety disorder NOS (Docket No. 11, pp. 522, 524 of 601). In assessing "Paragraph B"[15] criteria, Dr. Rudy found Plaintiff to have a mild degree of limitation with regard to his activities of daily living and maintaining social functioning and moderate difficulty in maintaining concentration, persistence, and pace (Docket No. 11, p. 529 of 601). Dr. Rudy found no episodes of decompensation or the presence of "Paragraph C"[16] criteria (Docket No. 11, p. 530 of 601).

### 4.   MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On that same day, Dr. Rudy also completed a Mental Residual Functional Capacity Assessment of Plaintiff (Docket No. 11, pp. 533-36 of 601). Dr. Rudy found Plaintiff to be moderately limited in several categories, including his ability to: (1) understand and remember detailed instructions; (2)

---

[15] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[16] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

carry out detailed instructions; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; and (6) respond appropriately to changes in the work setting (Docket No. 11, pp. 533-34 of 601).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful

17

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform.  *Colvin*, 475 F.3d at 730 (*citi*ng *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Barnett made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2012.

2. Plaintiff has not engaged in substantial gainful activity since November 15, 2008, the alleged onset date.

3. Plaintiff has the following severe impairments: epilepsy, status post aneurysm clipping, history of cocaine, cannabis, and alcohol dependence, neuropathic headaches, mood disorder, generalized anxiety disorder, and depressive disorder.

6. Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

7. Plaintiff has the residual functional capacity to perform medium work with the following limitations: (1) no climbing of ladders, ropes, or scaffolds; (2) avoid all exposure to hazards such as operational control of moving machinery and unprotected heights; (3) only simple, routine, repetitive tasks; (4) only work in a low stress job with no more than occasional decision making and changes in the work setting; (5) no production rate or pace work; and (6) only superficial interaction with the public and coworkers.

8. Plaintiff is unable to perform any past relevant work.

9. Plaintiff was thirty-three years old, which is defined as a younger individual age 18-49, on the disability onset date.

10. Plaintiff has at least a high school education and is able to communicate in English.

11. Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the Plaintiff is "not disabled" whether or not the Plaintiff as transferable job skills.

12. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

19

13.     Plaintiff has not been under a disability, as defined in the Social Security Act, at any time from November 15, 2008, the alleged onset date, through the date of this decision.

(Docket No. 11, pp. 16-26 of 601). ALJ Barnett denied Plaintiff's request for DIB (Docket No. 11, p. 26 of 601).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted))

## VII. DISCUSSION

A.     PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff alleges that the ALJ erred by: (1) not assigning Dr.

20

Dotson's opinion controlling weight, thereby violating the treating physician rule; (2) ignoring portions of Dr. Halas' opinion; (3) assigning great weight to the opinion of state examiner Dr. Rudy, depsite the fact that Dr. Rudy's opinions were issued prior to the opinion of Dr. Dotson; and (4) posing an incomplete hypothetical question to the VE based on an incorrect mental residual functional capacity assessment (Docket No. 15).

**B.     DEFENDANT'S RESPONSE**

Defendant disagrees and argues that ALJ Barnett properly addressed the opinions of Drs. Dotson and Halas (Docket No. 16). Defendant also alleges that the ALJ was entitled to rely on the opinion of Dr. Rudy regardless of when it was issued (Docket No. 16). Furthermore, the ALJ properly assessed all evidence of record in forming his hypothetical question and, as such, was entitled to rely upon the VE's answer (Docket No. 16).

**C.     DISCUSSION**

**1.     TREATING PHYSICIAN RULE**

In his first assignment of error, Plaintiff alleges that the ALJ improperly discounted the opinion of Plaintiff's neurologist, Dr. Dotson, without performing the required statutory analysis (Docket No. 15, pp. 11-12 of 17). The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

21

> The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.
>
> [T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted). ALJ Barnett assigned the opinion of Dr. Dotson only little weight, stating that Dr. Dotson's statement that Plaintiff needs "accommodations and compensatory techniques" before returning to work was too vague (Docket No. 11, p. 24 of 601).

Before according any weight to the opinions of a claimant's physicians, the ALJ must first determine which physicians he will consider to be "treating sources." "A physician is a treating source if he has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation that is typical for the treated conditions." *Blakley*, 581 F.3d at 407 (*quoting* 20 C.F.R. § 404.1502) (internal quotations omitted)).

Records show that Plaintiff first saw Dr. Dotson in September 2009 (Docket No. 11, p. 459 of 601). Over the next two years, Plaintiff saw Dr. Dotson a total of nine times (Docket No. 11, pp. 235-601 of 601). Dr. Dotson prescribed medication, performed neurological testing, and diagnosed Plaintiff

22

with his current neurological and mental health impairments (Docket No. 11, pp. 235-601 of 601). Based on the evidence, it is clear that Dr. Dotson is Plaintiff's treating physician.

Once accorded treating physician status, Dr. Dotson's opinion is entitled to controlling weight. *See Blakley*, 581 F.3d at 406. To assign anything less requires the ALJ to specifically determine and state the amount of weight given to the opinion, based on the factors iterated in *Blakley*, originally set forth in 20 C.F.R. § 404.1527(d)(2): (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, and (5) any specialization of the treating physician.

Throughout his opinion, ALJ Barnett makes very little reference to the findings and opinion of Dr. Dotson. The first time he mentions the doctor by name is to discount her opinion as "vague," and even then fails to provide any additional justification (Docket No. 11, p. 24 of 601). ALJ Barnett makes no mention of the length of the treatment relationship, frequency of examination, supportability of Dr. Dotson's opinion, or the consistency of her opinion with the record as a whole (Docket No. 11, pp. 16-26 of 601).

Furthermore, ALJ Barnett fails to provide any "good reasons" for discounting Dr. Dotson's opinion. As stated previously, an ALJ must give good reasons in his notice of determination or decision for the weight he gives a claimant's treating physician. *Blakley*, 581 F.3d at 407; *see also* 20 C.F.R. § 404.1527(c)(2). These good reasons "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley*, 581 F.3d at 407 (*quoting SSR* 96-2p, 1996 SSR LEXIS 9 at *12) (internal quotations omitted)). Here, ALJ simply

23

discounted portions of Dr. Dotson's opinion as "vague" and contrary to Plaintiff's own assertions (Docket No. 11, p. 24 of 601). This reasoning is not sufficient to satisfy the "good reasons" requirement.

It is a fundamental principle of administrative law that an agency is bound to follow its own regulations. *Wilson*, 378 F.3d at 545. "An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process." *Id*. (*citing Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (internal citations omitted)). Courts have remanded the decision of the Commissioner when it has failed to articulate "good reasons" for not crediting the opinion of a claimant's treating physician. *Wilson*, 378 F.3d at 545.

Based on the ALJ's failure to abide by the requirements of the treating physician rule, the decision of the Commissioner on this assignment of error is reversed and remanded to the Commissioner for further discussion, pursuant to sentence four of 42 U.S.C. § 405(g).

## 2.    MEDICAL SOURCE OPINIONS

In his second and third assignments of error, Plaintiff alleges that ALJ Barnett failed to properly address the opinions of various other medical sources (Docket No. 15, pp. 12-14 of 17). First, Plaintiff alleges that ALJ Barnett erred by only selectively addressing the opinion of Dr. Halas, whom Plaintiff saw for a psychological evaluation at the request of the BDD (Docket No. 15, pp. 12-13 of 17). In his third assignment of error, Plaintiff alleges that ALJ Barnett improperly gave great weight to the opinion of state examiner Dr. Rudy, who issued her opinion regarding Plaintiff's mental health status and limitations in July 2010, several months before Plaintiff's neurologist, Dr. Dotson, issued her opinion on the same subject (Docket No. 15, pp. 13-14 of 17). Plaintiff's argument with regard to

24

both Drs. Halas and Rudy is without merit. Plaintiff's claims essentially involve the ALJ's failure to accurately capture Plaintiff's residual functional capacity. As such, a brief discussion of residual functional capacity is helpful.

### a. RESIDUAL FUNCTIONAL CAPACITY

To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities. *Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). The Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

25

### b.  MEDICAL SOURCES GENERALLY

To properly determine a claimant's residual functional capacity, the Commissioner must necessarily evaluate both medical and *opinion* evidence. Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite the impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). While the Social Security Administration recognizes that the opinions of a claimant's treating physician(s) bear special significance and are sometimes entitled to controlling weight, the Commissioner has an obligation to examine opinions from *any* medical source on *any* issue, even those expressly reserved to the Commissioner. SSR 96-5p, 1996 SSR LEXIS 2, *4-6 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1527(b), 416.927(b). "Because state agency consultants are experts in the Social Security Disability programs, the rules set forth in 20 C.F.R. §§ 404.1527(f) and 416.927(f) require an ALJ to consider the consultants' findings of fact about the nature and severity of a claimant's impairment(s) as opinions of non-examining physicians." SSR 96-6p, 1996 SSR LEXIS 3, *4-5 (July 2, 1996). An ALJ is "not bound by findings made by State agency or other program physicians . . ., but [he] may not ignore these opinions and must explain the weight given to the opinions in their decision." *Id*. at *5. These opinions can be given weight, however, "only insofar as they are supported by evidence in the case record." *Id*. at *6.

### c.  DR. HALAS

As noted by the ALJ, Plaintiff met with Dr. Halas at the request of the BDD on June 29, 2010 (Docket No. 11, p. 24 of 601). Upon evaluation, Dr. Halas found Plaintiff to be oriented to time, place, and person, and hesitant and nervous, but cooperative (Docket No. 11, p. 24 of 601). He had a flat and

26

constricted presentation and generally tended to minimize or deny problems (Docket No. 11, p. 24 of 601). Plaintiff's speech pattern was slow and his thoughts were rambling, rather than specific and goal-oriented (Docket No. 11, p. 24 of 601). The coherency and relevancy of his responses were good, but Plaintiff showed a slight flight of ideas (Docket No. 11, p. 24 of 601). Plaintiff had relatively high levels of anxiety and seemed tense, anxious, and apprehensive during the evaluation (Docket No. 11, p. 24 of 601).

Nevertheless, Dr. Halas found Plaintiff's overall quality of consciousness to be good and without any confusion or lack of awareness (Docket No. 11, p. 24 of 601). He further found Plaintiff's general intelligence level to be in the average range, with a full-scale IQ of 101 (Docket No. 11, p. 24 of 601). The evaluation showed that Plaintiff's primary weakness was in processing speed (Docket No. 11, p. 24 of 601). Dr. Halas concluded that Plaintiff's ability to understand, remember, and follow instructions, as well as his ability to maintain attention and concentration to perform simple, repetitive tasks was not impaired, and his ability to relate to others, including coworkers and supervisors, only mildly impaired (Docket No. 11, p. 24 of 601). Dr. Halas found Plaintiff's ability to withstand the stresses and pressures associated with most day-to-day work activities to be moderately impaired (Docket No. 11, p. 24 of 601).

Plaintiff alleges that ALJ Barnett failed to include in his mental residual functional capacity assessment Dr. Halas' mention of the significant discrepancy between Plaintiff's scores and his adversely affected processing speed or Dr. Halas' conclusion that Plaintiff's ability to withstand stress and pressure was likely to deteriorate under the pressures of a normal work setting (Docket No. 15, pp. 12-13 of 17). While Plaintiff is correct that ALJ Barnett did not include, in specific detail, each finding and restriction suggested by Dr. Halas, the ALJ did, in fact, capture the overwhelming theme of Dr.

Halas' opinion: Plaintiff suffers some restriction with regard to the typical work environment (Docket No. 11, p. 505 of 601). Based on Plaintiff's reduced processing speed, ALJ Barnett limited Plaintiff to (1) simple, routine, and repetitive tasks; and (2) no production rate or pace work (Docket No. 11, p. 21 of 601). Based on Dr. Halas' determination that Plaintiff's ability to withstand the stresses and pressures associated with day-to-day work activity was moderately limited, and his finding that Plaintiff's psychological adjustment levels are likely to deteriorate under these pressures, ALJ Barnett limited Plaintiff to work only in a low stress job with no more than occasional decision making and changes in the work environment (Docket No. 11, p. 21 of 601).

Furthermore, *even if* ALJ Barnett had chosen to leave out some of Dr. Halas' restrictions, he was entitled to do so. Based on the regulations, an ALJ is not required to accept the restrictions set forth by a medical source in their entirety, if at all. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). Therefore, the Magistrate finds Plaintiff's second assignment of error to be without merit and the decision of the Commissioner is affirmed as to this issue.

### d.    DR. RUDY

With regard to the opinions of state examiner Dr. Rudy, Plaintiff alleges that ALJ Barnett improperly gave great weight to Dr. Rudy's opinion regarding Plaintiff's mental limitations since it was proffered before the opinion of Plaintiff's treating neurologist, Dr. Dotson (Docket No. 15, pp. 13-14 of 17). Plaintiff regards the opinions of Dr. Rudy as "premature" and therefore not entitled to great weight (Docket No. 15, p. 14 of 17). Again, Plaintiff's argument is without merit.

On July 9, 2010, Dr. Rudy completed both a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment for Plaintiff (Docket No. 11, pp. 519-36 of 601). Dr. Rudy found that Plaintiff suffered from depressive disorder NOS (Docket No. 11, p. 522 of 601) and anxiety

disorder NOS (Docket No. 11, p. 524 of 601), but ultimately concluded that Plaintiff did not suffer from any more than "moderate" restrictions with regard to the Paragraph B criteria (Docket No. 11, p. 529 of 601). Furthermore, Plaintiff was only "moderately limited" in six of the twenty assessed categories on the Mental Residual Functional Capacity Assessment (Docket No. 11, pp. 533-34 of 601). Based on his assessment of the entire evidence of record, ALJ Barnett assigned Dr. Rudy's opinion great weight (Docket No. 11, p. 24 of 601).

Just as is the case with a treating physician, "the opinions of State agency medical and psychological consultants . . . can be given weight only insofar as they are supported by evidence in the case record . . . ." Social Security Ruling 96-6p, 1996 SSR LEXIS 3, *6 (July 2, 1996). The ALJ must still consider such factors as the supportability of the opinion, the consistency of the opinion with the record as a whole, any explanation of the opinion, and the specialization of the state examiner. *Id*. In some cases, the opinion of the state examiner may be entitled to *greater* weight than the opinion of a treating physician. *Id*. at *7. This may be the case in situations where, for example, the state examiner's "opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source." *Id*. In that same vain, however, SSR 96-6p states that an ALJ is only required to obtain an updated medical opinion when "additional medical evidence is received that in the opinion of the [ALJ] or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." 1996 SSR LEXIS 3, at *9.

Here, Dr. Rudy rendered her opinion in July 2010 (Docket No. 11, pp. 519-36 of 601). Six months later, in January 2011, Dr. Dotson conducted neuropsychological testing on Plaintiff which

yielded the following results:

> generally intact with average premorbid estimate and average current Full Scale IQ, stronger nonverbal skills consistent with reported baseline; slowed fine motor speed, phonemic verbal fluency and weak learning of word list; clinically meaningful depression and anxiety; consistent pattern of poor longstanding coping ability; longstanding inattention possibly consistent with undiagnosed ADHS, Combined Type; likely cognitively capable of returning to work following appropriate treatment of depression and anxiety and with use of few accommodations and compensatory techniques.

(Docket No. 11, p. 584 of 601).

After review of these two opinions, the Magistrate finds them to be remarkably similar. Both Dr. Dotson and Dr. Rudy determined that Plaintiff suffered from depression and anxiety (Docket No. 11, pp. 522, 524, 584 of 601). Both Dr. Dotson and Dr. Rudy determined that Plaintiff suffered from some form of inattention (Docket No. 11, pp. 533, 584 of 601). Both examiners found that Plaintiff was likely not able to perform at a consistent pace, had poor coping skills, and would have at least moderate difficulty responding to changes in the work setting (Docket No. 11, pp. 534, 584 of 601).

Furthermore, as noted by ALJ Barnett, Dr. Rudy's opinion was supported by Plaintiff's record as a whole. In February 2009, Plaintiff denied any depression or anxiety, stating that his mood was "pretty good" (Docket No. 11, p. 385 of 601). At that time, his physician assigned him a GAF score of 55, indicating moderate symptoms[17] (Docket No. 11, p. 390 of 601). In January 2011, acknowledging his slowed processing speed, Plaintiff's own treating physician stated he could return to work (Docket No. 11, p. 584 of 601). During an initial psychiatric evaluation in October 2011, Plaintiff had poor concentration and focus but was oriented (Docket No. 11, p. 582 of 601). His GAF score was fifty (Docket No. 11, p. 582 of 601). By March 2012, Plaintiff was reporting an improved ability to manage

---

[17] A GAF score of 55 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV, 34.

30

his emotions, even without medication (Docket No. 11, p. 597 of 601). Plaintiff consistently earned an average IQ score (Docket No. 11, pp. 306, 504 of 601). While it is clear that Plaintiff experiences a slower processing speed as a result of his brain aneurysm, ALJ Barnett took this into consideration in rendering his mental residual functional capacity assessment, limiting Plaintiff to: (1) simple, routine, and repetitive tasks; (2) a low stress environment with no more than occasional decision making and changes in the work setting; and (3) no production rate or pace work (Docket No. 11, p. 21 of 601).

Therefore, as Dr. Rudy's opinion was supported by and is consistent with the evidence as a whole, the Magistrate finds that ALJ Barnett did not err by assigning the opinion great weight. Plaintiff's third assignment of error is without merit and the Magistrate recommends that the decision of the Commissioner on this issue be affirmed.

### 3.    HYPOTHETICAL QUESTION

Finally, Plaintiff alleges that the ALJ erred by relying upon the opinion of the VE, given the ALJ's failure to pose a proper hypothetical question (Docket No. 15, pp. 14-15 of 17). Defendant disagrees (Docket No. 16, p. 15 of 17). Plaintiff's argument is without merit.

Step four of the sequential evaluation process requires the ALJ to determine whether a claimant has the residual functional capacity to perform his past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920 (e). Past work is generally considered "relevant" when it was performed within the last fifteen years, lasted long enough for an individual to learn it, and was substantial gainful activity. 20 C.F.R. §§ 404.1565(2), 416.965(a). The relevant inquiry is whether the claimant can return to his past *type* of work, not just his past specific job. *See Studaway v. Sec'y of Health & Human Servs.*, 815 F.2d 1074, 1076 (6th Cir. 1987).

To satisfy this requirement, the ALJ may call upon a VE to offer expert testimony. In the Sixth

Circuit, a VE's testimony must be based on a hypothetical question which accurately portrays the claimant's physical and mental impairments. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This evidence may only be used as substantial evidence of a claimant's residual functional capacity when that testimony is in response to a hypothetical question that "accurately portrays [the claimant's] individual physical and mental impairments." *Davis v. Sec'y of Health & Human Servs.*, 915 F.2d 186, 189 (6th Cir. 1990). However, it is also "well established that an ALJ . . . is required to incorporate only those limitations accepted as credible by the finder of fact" into the hypothetical question. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

The ALJ posed the following hypothetical question to the VE:

> Hypothetical one, assume an individual the claimant's age, education, and work experience who is limited to the full range of medium exertional work as defined in the regulations with no climbing of ladders, ropes, or scaffolds and must avoid all exposure to hazards such as operational control of moving machinery and unprotected heights. Additionally, the individual is limited to simple, routine, and repetitive tasks, limited to low stress job[] defined as no more than occasional decision making required and no more than occasional changes in the work setting. Such an individual would be restricted to no production rate or pace work, that is no, no straight production requirements, and limited to superficial interaction with the public and with coworkers.

(Docket No. 11, pp. 54-55 of 601). Plaintiff alleges that the hypothetical was incomplete because "Plaintiff has demonstrated that the ALJ's residual functional capacity assessment is insufficient" (Docket No. 15, p. 15 of 17). Examination of Plaintiff's full record reveals that ALJ Barnett properly included all of Plaintiff's *credibly established* limitations.

Although not clearly defined in this assignment of error, Plaintiff appears to take issue with the ALJ's failure to include Plaintiff's: (1) slower processing speed; (2) ability to withstand stress and pressure; (3) moderate restriction in concentration, persistence, and pace; and (4) need for

32

"accommodations and compensatory techniques" (Docket No. 15). With regard to speed- and pace-based limitations, Plaintiff relies, *inter alia*, on *Ealy v. Comm'r of Soc. Sec.* (594 F.3d 504 (6th Cir. 2010)), for the proposition that the ALJ's hypothetical question must include pace or speed-based restrictions given his conclusion that Plaintiff had moderate limitations with regard to social functioning, concentration, persistence, and pace (Docket No. 15, p. 13 of 17). Plaintiff is incorrect. In *Ealy*, the plaintiff's doctor *specifically* limited him to "simple repetitive tasks [for] [two-hour] segments over an eight-hour day where speed was not critical." 594 F.3d at 516. In the case at hand, no medical professional has placed Plaintiff under such a severe or specific restriction (Docket No. 11, pp. 235-601 of 601).

The ALJ appropriately accounted for Plaintiff's first two issues by including in his hypothetical limitations to: (1) simple, routine, and repetitive tasks; (2) a low stress job with no more than occasional decision making and changes in the work setting; and (3) no production rate or pace work (Docket No. 11, pp. 54-55 of 601). It also seems clear that the ALJ did not include Dr. Dotson's "accommodations and compensatory techniques" because such limitations were simply too vague. No where in her medical reports does Dr. Dotson explain what such accommodations should look like or include. As stated above, the ALJ is only required to include in his hypothetical "those limitations accepted as credible by the finder of fact." *Casey*, 987 F.2d at 1235. Therefore, Plaintiff's claim is without merit and the decision of the Commissioner with regard to this issue is affirmed.

33

## VIII. CONCLUSION

For the foregoing reasons, this matter is reversed and remanded to the Commissioner to consider the opinion of Plaintiff's treating neurologist, Dr. Dotson, in accordance with the statutory requirements, pursuant to sentence four of 42 U.S.C. § 405(g). The decision of the Commissioner with regard to Plaintiff's second, third, and fourth assignments of error is affirmed. **SO ORDERED.**

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   December 11, 2013